Good morning, Your Honors. May it please the Court, I'm Ann Voll of Reno, Nevada, representing Dennis Bonanoma in this employment discrimination action. Good morning. I have a request of you from the standpoint that I know you've got two matters on today, and one involves the sanctions against you and the other involves the underlying summary judgment on your client. And while I want you to take an opportunity to do both, I would like to, you know, probably two-thirds on the summary judgment and one-third on the sanctions, because I think that the summary judgment involves more issues. So don't, you know, don't let us get – I don't want to take the bulk of the time on the sanctions. But my own preference, if this would please the Court, my own preference would be to spend nine-tenths of the time. Okay. That's fine. I just – I want to make sure you can cover both, but don't – I don't want us to get bogged down on the sanctions part because there's a lot. May I ask you to keep your voice up and to speak into the microphone? Yes. Is that better? Yeah. I have it a little lower. Is my voice louder with the positioning? Now it is. Yes. Sorry, Your Honor. And I would like to reserve a few minutes for rebuttal. What I would like to do is sum up the many facts that are on the record which are undisputed between the parties in which we think support this case, inasmuch as this was a summary judgment which we think should not have been granted. The plaintiff appellant, Dennis Boninoma, is a white male who was 54 years old at the time of his December 2002 termination. I think we know the facts. The first one that I want you to talk about is on the race discrimination. What do you have – I think the court found you didn't have a prima facie case on that one. Right. What do you have other than the fact that he's white and there were two African Americans that were evaluating him? What else is there in the record about discrimination? Okay. Because I would say that's not enough. What more is there? We contend that the actual replacement for Dennis Boninoma was a person named Joanna Osborne who was decades younger but also was a person of a Philippine island heritage who spoke the language of those islands and was definitely an ethnic person of that particular background. That is undisputed. There was a two-year hiatus between when she went into the job and the person who first took over his job when he was removed from it was a person named Palmer who was female. Ms. Vole, you're arguing a case to a jury. That's not the issue. I think the issue is what evidence was sufficient to create a triable issue of fact that there was race discrimination involved. He was not replaced by a person of another color. Normally, that is an element of your prima facie case as it is with your gender discrimination, as it is with your age discrimination. But where is the prima facie case that he was discriminated against in favor of someone of another color? Well, the person Osborne that we contend was the actual replacement because she was the next person who held the actual job that was held by Boninoma. And that's the one that's two years later? And that is two years later. And we contend that the person who intervened, Kathy Palmer, who was actually holding two jobs, her own prior job plus Boninoma's job, we contend that the company never intended to keep her in that job, that the company gave her two jobs at once.  That they gave her an office in the basement, that they gave her no time off for meals, and that ultimately she quit. Our contention is that they had a methodology at the power company that was used on Boninoma and also on this Kathy Palmer to make their work so unpleasant for them in a thousand large and small ways that they would resign. This worked with Kathy Palmer. It did not work with Boninoma. This methodology that we're talking about is described in the affidavit of Patricia Essie, and it is the methodology that was used on Boninoma and was not used successfully because he hung in there. He stayed. He would not leave. Others, such as Palmer, left. So that we say that she was not, in good faith, his replacement. She did not hold his job. His job was held by Joanna Osborn, and it's a very odd situation because you don't usually in a large company take a person who is holding a full-time job and give that person an additional full-time job. Okay. Race one is your weakest one. Go to the gender and the age. What do you have? I think the court, I think, somewhat sort of questioned whether you had a prima facie case, but even assumed a prima facie case and then got into pretext and said that you either failed at prima facie or failed at pretext. What do you have on the age and the gender? Okay. On the age. I'm giving you all inferences in your favor. Yes. On the age, the first replacement was a person that was only five years younger. That was Palmer. The second replacement was a person who was some 20 years younger. When she competed for the job, she was competing against a male who had a college degree and many years of experience with the power company. He did not get the job. That was a male in his middle 40s. I believe his name was Sloan. As far as age goes, we have a chart on the record that was prepared by the power company. Of all the people who were terminated by the power company during the relevant time frame, then subtracting from that the persons who are irrelevant to this case who happened to be members of the bargaining unit who were treated in a different way, we find that on the whole, younger people are terminated for cause. Older people may be terminated for no cause. There was an attempt on the part of Boninoma to get a lateral sort of transfer. After he was removed from his job during the course of the year 2002, he went throughout the company. He applied for those two jobs for which he felt himself qualified, which were open. He was not placed in those jobs so that there is a demonstrated unwillingness to laterally transfer him. In his affidavit, he states that he observed that older persons in the company were not given lateral transfers and younger persons were given lateral transfers. Boninoma's own treatment was discriminatory towards him starting in 1999 when he applied for the job of team leader's facilities at the time of the merger of the two power companies. The job was given to a distant cousin of his named Andrini who had only a high school diploma and who was 13 years younger. Boninoma competed for that job unsuccessfully. He, with a degree in engineering plus many years of experience in the company and many skills due to his engineering background and his related experience in the company, would have directly qualified him for that particular job. We also think that discrimination is strongly evidenced by the fact that the company chose to place Boninoma in the promotion job at the time of the merger for which it had pre-deemed him to be unqualified. Now, as far as I'm trying to emphasize. Scalia. How about gender? Boninoma. Your Honor, regarding gender, he was working in a department wherein all of the people on the administrative professional level, as opposed to the union people, all of the people on the administrative professional level who reported to Angela Branch, his supervisor, except for himself, were females. By removing him and replacing him with a female, his supervisor succeeded in creating for herself an all-female staff. And there was nothing about these jobs that in any way suggested that they should be held by a female rather than a male or a male rather than a female. This same person then hired the replacement for, hired the second person, Joanna Osborne, also a female, again choosing that female over a male who at least arguably had far higher qualifications for the job. All right. Let's say that you make out your prima facie case and the defendant comes forward with a legitimate business purpose to wit that Mr. Boninoma is not qualified to do good work. And then you have the burden of showing pretext. What factual evidence did you present from which a reasonable person could find that there was pretext? Okay. Regarding his performance, this Mercer Company came in for its second consultation in 2002, very early in the year 2002. There's evidence that they were at the company in, certainly in March or April of 2002. And they evaluated all of the various departments of the company, among them support services, which was his. And unlike the rather poor grade that they gave to human resources and the way it handles its discipline and its firings, they gave a fine passing grade to the department, which had been run by Mr. Boninoma for the prior two years. So that is certainly objective evidence. What could be more objective that he was doing his job right? A consulting company comes in from Massachusetts and spends a certain number of weeks or months surveying the power company and gives report cards. And as indicated in his affidavit, Boninoma saw the report on his department, and his department got a fine rating. And certainly if the power company had any evidence to the contrary, as far as that report card from the Mercer Company, they would have brought it forward. But also, Mr. Boninoma's job just contained some add-ons to what he had been doing before. When he got the promotion in 1999, he was supervising the same people after the promotion and before. He was doing the same tasks after the promotion as before. There were just tasks added on. As I'm sure the Court noted, he was doing a job which entailed a diverse group of responsibilities, purchasing for the entire building. Well, let me tell you what I think your possible arguments are in pretext, and I'm going to ask the other side to evaluate. There's evidence in the record that includes he was 17 years of service prior with the company where he had done well. All right. There's evidence that Branch and or Kirkland had thought he was not qualified to be a team leader before he was appointed to be a team leader. There's a course of treatment that arguably mirrors the Mercer method that you're talking about of disposing of older workers. There's evidence that from time to time he was appointed to be a team leader. Branch kept a file on him, arguably in anticipation of firing him. Also, there's evidence in the record that Branch continued to be dissatisfied with Boninoma even after he received a satisfactory evaluation. There's evidence that Branch misled Boninoma concerning the issue of an anthrax meeting, and there's also evidence that even during the last six months at the company he performed useful work. Okay. Those are the things that I think you put in the record on pretext, and I'm going to ask the other side to respond. Ms. Vole, this was called a lifeline. May it please the Court. My name is Karen Taylor, and I'm with Littler Mendelsohn. Good morning. Good morning. Boninoma is a white male. We know that. We know that he was promoted to the team leader position when he was 52 years old. He was terminated from that position just three years later when he was 55 years old, and he was replaced by Kathy Palmer. She was in that position for two years doing those duties. It is completely irrelevant that she was doing other duties at the time. Okay. The fact that you seem to, the fact that she was only five years younger, is that dispositive for you under Ninth Circuit law? It is because of the Douglas opinion, where there was substantial evidence of a satisfactory performance. We definitely do not have that here. We have some argument by Boninoma that he was doing a good job, but that was his subjective opinion. The objective evidence is that he was not doing a good job. So that Douglas opinion doesn't apply. Well, you know, I guess from the standpoint where it appears that the trial judge did some weighing of evidence about whether he was doing a good job or not. There's definitely his side of the story, and then there are the evaluations, which, so, I mean, you know, the fact that the trial judge did some weighing there, we can't do that. I mean, that, you know, I agree that there was put in a business reason, but then it goes back to pretext. I don't think we can resolve here on a summary judgment, or the trial court should have resolved whether he was doing a good job or not. Did you see that in the record, that the trial judge was doing that? Well, and I see that the record shows that he wasn't qualified, but I also do see that even if the affirming of the district court's order isn't on that one, it would be on pretext, because there is no pretext here. Well, what about the things that I just said that I'd called out of the record? Yeah. Before you get to that, you say that you're taking the position that since the replacement was only five years younger than he was, that as a matter of law, that is not sufficient for a prima facie case of age discrimination. How do you deal with the case of Douglas v. Anderson, which we held in 1981, that an employee who proved he was replaced by a person five years his junior and within the class protected by the Age of Discrimination in Employment Act had established a prima facie case? Because in that case, there was substantial evidence of satisfactory performance, and that was the distinguishing factor. Five years is enough for age discrimination. So you can see that point? I can see that, yes. With respect to the Mercer method, if we could start on that one, that was in 1993, nine years before Mr. Boninoma was terminated. Stray remarks that had nothing whatsoever to do with his termination, those remarks were made by an independent consultant, not an employee of Sierra Pacific, and the decision makers in this case were Angela Branch and Marika Meyer, and they weren't even aware of those remarks or any of it. They weren't involved in those committee meetings back then, completely unrelated to the process of his termination in this case. Well, now, I realize on, you know, apparently there was some file that Branch was keeping. Now, you know, whether it was a secret file or not, it does appear to be, you know, there are allegations or I think the plaintiff is entitled to say that this was something that he wasn't aware of. I mean, we have to infer, you know, for purposes of summary judgment. So she's putting marks in there even that, you know, which is not exactly a personnel file. You're supposed to advise people of what you're putting in there. Then you also have he says, you know, Branch says she told him the meeting was at 7. He says he was told another time, and then, you know, then he gets, you know, taken to the, you know, taken out to the woodshed for missing the important anthrax meeting. Well, we can't, you know, we can't resolve that factual dispute here, but I think he's entitled to the inference that it was 7 and what, you know, in when we're evaluating pretext, aren't we? And for that, even if we are on that particular issue, then we still have all of the other evidence that came forward through Angela Branch and Marika Meyer that he wasn't qualified for the job. And that issue goes to the prima facie case, not to pretext. That wouldn't be specific and substantial evidence of pretext. And then for the file. Well, what if you give the inference from the standpoint that they're keeping the file and even though at some times that he was doing okay or whatever, that you're trying to make book on firing him even though other evaluations are saying that he's doing okay? There was no testimony that she was keeping, that Angela Branch was keeping that file before firing him. She said she keeps those files in every employee. Steve Moyer, the prior supervisor of Blahnanoma, also keeps those files. Sierra Pacific, now NV Energy, keeps those files. Their manager notes. And it's advisable to keep those so that when the performance evaluation comes around or when a supervisor decides on entering a disciplinary notice, they have the backup for that and they can compile the information to go into that. Doesn't that raise some sort of inference? In fact, the fact that you're not sharing it with someone, the fact that you're not giving a person to respond to it, and then later when you decide to pull the trigger on them, you whip it out and say, and furthermore. No, because those notes go into the disciplinary notice, and the disciplinary notice is what goes into the file, and that's part of the NRS 613 where the employee is entitled to see the personnel file. They're not entitled to see manager's notes. But that information does go into the evaluation or the discipline, and that happened here. Angela Branch did use that information, and she put it into, for example, the 2001 performance evaluation that he did see and he did respond to. But how far back did the notes go? She kept those notes from 1999 to 2001. There was a performance improvement plan in the year 2000. So if you're doing something wrong in 1999, no one talks to you about it, but then in 2001 when they decide to do something about it, then they get to pull it out and spring it on you? Well, there was an intermediary issue there where she put him on a performance improvement plan in April 2000, and he was in that job only starting as of November 1999. So as of April 2000, he knows of the issues going on. And then there was the 2000 performance evaluation that was meet standard, but there were still two areas within that evaluation that he was lower than. He did not meet standard. So he still knew of what the problems were with his performance as she viewed them in that 2000 performance evaluation. And then the 2001, he did not meet standard. So, again, those notes are compiled, put into that evaluation, and he was able to rebut those evaluations. Does he get any, I mean, how does it fit into, apparently, this is a very long-time employee, and for 17 years he was doing, performing fine, right? Does that factor in in any way? I mean, can that fit in anywhere when you're comparing other things on pretext, or does he get any, or is that something we just throw away? I don't think that we throw it away, but we do show that shows why the company would promote him and not deem him unqualified, as Ms. Vole has argued, because he was a long-term employee. And MV Energy Sierra Pacific is the type of employer that does want to promote from within, give employees a chance. He was doing those duties before, and he was doing an okay job. There were a couple of problems that he had with Steve Moyer. Is there any evidence in the record that Branch and or Kirkland thought he was unqualified for that position before he even went in it? Is there any evidence in the record to that effect? From Branch, no. From Jacqueline Kirkland, yes, there is. But Jacqueline Kirkland was not his manager, so that's irrelevant. It's only the testimony of Angela Branch that would be relevant to that issue, and she said that she felt that he was qualified, and that's why she gave him the first performance evaluation in the year 2000. Wait a minute. Question. Dennis, you felt, was not qualified for the job, right? Branch replied, correct. That's in her depositions, page 61, 13 through 15. Later she said she did think he was qualified, but that's two different stories. Why is the inconsistency of the person who made the decision sufficient material evidence to raise a triable issue of fact? Because she thought that he could perform the job with improvements. He had the skills to do that job. The problem with Dennis was that he was not qualified. Wouldn't that be something that the jury should gauge? Which story should they believe? The first time she said she thinks he wasn't qualified for the job or the second story which you've just given now and could argue to the jury? I believe that those are consistent, the way that she explained it in her deposition. Right. However. Could reasonable people disagree with you? Sure. However, that does not mean that summary judgment should be reversed because that doesn't show pretext. That doesn't show that the reason that she put him in that position or, I'm sorry, that she terminated him was discriminatory. She put him in that position. She gave him a chance. She's the one that promoted him. He didn't perform on and off. He didn't perform. There were times when she said that he was a good performer. There were other times when he was not. But then he just continued slacking off. That's essentially what happened. And so she said he's got to be removed from that position. He should not be a supervisor. So the fact that she would talk about him lacking some qualifications for that job as a supervisor doesn't show that she had discriminatory motive when she terminated him. And that's the pretext element, which Buona Noma does not meet here at all. Since you don't have any time for rebuttal, do you want to address the sanctions? Because I suspect that those will be addressed in the rebuttal time. Sure. With respect to the sanctions against Ms. Vole, Your Honors, the abuse of discretion standard applies here, not the de novo review that Ms. Vole has asserted. And that's under the Grantham Brothers case, the Ninth Circuit case following the U.S. Supreme Court case of heart marks. The district court's decision was not based upon an erroneous view of the law or clearly erroneous assessment of the evidence. The malpractice claim that Ms. Vole attempted to bring about against general counsel of Sierra Pacific, it was malpractice, defamation, and fraud. And that was all based upon one statement made in a position statement to the Nevada Equal Rights Commission, not even by general counsel, Jerry Mikesell. It was made by the diversity coordinator of Sierra Pacific at the time. The statement was that employees were, quote, shell-shocked by their previous supervisor. That's where the confusion came in, the terms their previous supervisor, because Dennis Guantanamo was a previous supervisor of Kathy Palmer, who had made the statement. In that particular case. Well, it's sort of my understanding about that from the standpoint that she was sanctioned because she brought claims that there was absolutely no law that supported the claims, one being the malpractice where there was no ‑‑ there has to be an attorney-client relationship, and there was no relationship, and the other had to do with the litigation privilege that the statements were made at the EEOC or something to that effect, which was clearly covered by litigation privilege. Is that what ‑‑ That's exactly it. That was the main focus of Judge Cook's sanctions order, and the malpractice claim was so basic, you go back to just the elements of the claim, attorney-client privilege, there certainly wasn't that here. There was an adverse party relationship where there could be no duty of care. There certainly isn't a duty of care between an attorney and the adverse party, and that's what Ms. Voll was attempting to ‑‑ essentially attempting to assert, which the basic law didn't support, and even she cited treatises and cases, and none of that supported that proposition whatsoever, or even an argument for the reversal of that position. And then with respect to the attorney-client ‑‑ well, she had also argued that there was no ‑‑ that there was third-party liability in this case, but general counsel did not make ‑‑ first of all, he didn't make the statement, but assuming that it was NV Energy on his behalf making the statement, he was not making any statement to Buonanoma to rely upon, so that theory failed as well. It wasn't like a legal opinion would be. It was nothing like that whatsoever. It was in support of Sierra Pacific's position, so there's no way that Buonanoma would have any reliance whatsoever on the adverse party's attorney's statement. Before the court sanctioned Ms. Voll, was there some discussion in terms of why don't you drop the charges and that it went on for a period of time before that she didn't drop the charges that the court put her on notice? There's no legal theory under here. Was there any, or was it, or how did that come about? We sent the Rule 11 letter. We had the motion for sanctions. The hearing was scheduled. And during some ‑‑ so after the motion for leave to amend was filed, and during that time there was discussion of her withdrawing the motion for leave to amend, but at that point, and this is why we had argued that it was filed for an improper purpose, because she did not want to deal with Jerry Mikesell, general counsel of Sierra Pacific. The statement that she had made that I presented to Judge Cook was that she wanted to handle negotiations with Patrick Hicks of my firm, and so thereby getting general counsel off of the case by filing the motion for leave to amend where the claim, the malpractice claim would have to be asserted against, would be asserted against Mr. Mikesell, and he certainly couldn't have represented himself. All right. So the court found that it was for that. Did the court make a factual finding that it was for that purpose? I know there was some evidence in the record that she admitted she didn't have a good relationship with that person. That's right. And it was both basis. So the two independent basis for Rule 11 sanctions, the frivolous claim, and then for an improper purpose, the court found both. All right. Thank you. Thank you. Before saying anything on my own behalf, might I just make a small embellishment to what's already been said concerning the discrimination case, and that is it is interesting to see that the only thing on the record that relates to Branch's state of mind at the time of the 1999 promotion is on the record at my excerpts 163. It's a scorecard that she wrote on him. The copy that we ever had was not entirely legible. And interestingly, Mr. Mikesell, when I was taking someone else's deposition concerning where are the other records that related to this hiring, Mr. Mikesell, on the record at 257, which occurs on the record in a number of places where in a deposition Mr. Mikesell, who's representing the power company, just enters his own testimony into the record, and he will say he has said on the record that all the records surrounding this particular promotion had been destroyed by the company. He did not say when they were destroyed. He simply said that they were destroyed, and that was at 257. Now, if I might say this, I think I had an excellent and very pleasant relationship with Mr. Mikesell. He and I had not so long before settled another case. We worked out a very, very satisfactory settlement for both sides and so forth. But that's not on the record. All right. In the record, don't you say something to the effect that you'd had a difficult relationship with him on this case? Certainly in court. I said that when the magistrate asked me, what is your relationship with him on this case? I said it's difficult. There were reasons why it was difficult, which I didn't want to elaborate at that time and which I can't speak to now. It's interesting how you're- All right. You're really out of time. So I'm going to give you one minute to, from the standpoint, why aren't the claims that you were making, that it would appear sort of Law School 101 that your client did not have a legal, a client relationship with, and also, too, it appears the statements were made in the litigation privilege. Why shouldn't the court have sanctioned you for bringing frivolous- I would like to point out, in the case, in the excellent case of Myers v. Amaretti Hess, which was cited by opposing counsel and which is spot on at page 65 and 66, the court details how far this absolute privilege for quasi-judicial proceeding extends. And it extends unless, quote, the matters at issue are, unless, quote, so obviously impertinent, dot, dot, dot, and so needlessly defamatory as to warrant the inference of express malice, unquote. And in this case where the matters that were presented were the employment of the personnel record of Palmer containing a statement about Linda B., who didn't even have anything remotely to do with this case and worked in a different city, I would say it did fall under that category. And I just need to say to the court that I was groping, I felt that something very unjust and bizarre had happened, and I was racking my brains for a legal theory that would encompass the strangeness and bizarreness of what was done. And when I learned from the deposition of Kirkland, which is on the record, that Mike Sell had prepared the presentation for the EEOC, truly my eyebrows raised, and I can't say anything other than that in defense of the situation. All right. We've allowed you two additional extra minutes. Thank you very much. The matter will stand submitted at this time. Thank you both for your argument in this matter.
judges: Noonan, Callahan, Bea